# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| DESIGN BASICS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:16-CV-175-HAB |
| | ) | |
| HELLER & SONS, INC. d/b/a HELLER HOMES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff is a prolific design firm, copyrighting more than 2,500 different designs and plans for moderately priced single-family homes. This case involves a claim by Plaintiff for copyright infringement of five of those designs. The issue before the Court now is Defendant's Second Motion for Summary Judgment (ECF No. 64), wherein Defendant asks this Court to determine, as a matter of law, that it did not infringe on any of Plaintiff's copyrights. Also before the Court is Defendant's Motion to Exclude and Strike Matthew McNicholas' Expert Report and to Bar Expert Testimony (ECF No. 80).[1] The Court concludes that, while the designs at issue bear superficial similarities to their allegedly infringing siblings, there nonetheless exist numerous differences which defeat any claim of copyright infringement. Accordingly, Defendant's Motion for Summary Judgment will be granted.

---

[1] Defendant also filed a Motion to Strike Portions of Plaintiff's Declarations (ECF No. 79). Defendant bases its Motion to Strike on Federal Rules of Civil Procedure 56(c) and 12(f), Federal Rules of Evidence 602 and 401(b), and Northern District of Indiana Local Rules 56-1(e) and 7.1. Because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies Defendant's Motion to Strike. The Court has noted Defendant's objections and will consider the objections to the extent they arise in the Court's summary judgment analysis.

# FACTUAL BACKGROUND

**A.**     ***Plaintiff's Business Model***

Plaintiff describes itself as a small residential design firm founded in Omaha, Nebraska, in the 1980's. Plaintiff has designed thousands of home designs from scratch, including more than 390 new designs since 2009. Plaintiff registers its architectural works with the United States Copyright Office before or near the time they are published and marketed.

For most of its existence, Plaintiff's primary source of income was in licensing its copyrighted designs. Plaintiff has more than 164,000 customers across the country that have purchased over 135,000 construction licenses, including more than 2,500 licenses in the last three years alone. Since many of the licenses were good for an unlimited number of builds for the licensed plan, Plaintiff states that it is "no exaggeration to say that hundreds of thousands—if not millions—of Americans live in homes designed by" Plaintiff. (ECF No. 73-1 at 2).

For much of the time Plaintiff was in the licensing business, business was good. Plaintiff's licensing fees range from $700 to $6,000. Since 2009, Plaintiff has issued more than 9,200 licenses totaling more than $7,135,000.00 in licensing revenue. Plaintiff has issued 234 licenses for the five designs at issue in this case since 2009, for a total of $131,718 in licensing revenue. At its peak in the late 1990's and early 2000's, Plaintiff was earning more than $4,000,000 per year from licensing revenues.

Plaintiff earned these kinds of revenues by making their designs ubiquitous. Plaintiff's marketing efforts included:

- Publishing and circulating more than ***4.2 million*** copies of 180 different catalogs and other publications containing the designs to builders like Defendant;
- Placing its copyrighted designs in third-party publications like Builder Magazine;
- Displaying its home plans, plan catalogs, and other publications at 446 big box retail locations;

2

- Distributing its home plan publications at home shows, conventions, and trade shows; and
- Displaying its copyrighted designs across the internet, including on its own site, www.designbasics.com.

## B. *Plaintiff's Business Suffers in the Wake of the Great Recession*

Somewhere between 2006 and 2008, Plaintiff decided that it would be easier and cheaper to cease its bulk mailing strategy and instead to focus on marketing through the internet. To that end, Plaintiff invested $435,000 in capital improvements, including updating its database system, purchasing and building two new websites, and working to raise its internet profile through search engine optimization ("SEO"). While these efforts succeeded in driving internet traffic to Plaintiff's website, they failed in increasing licensing revenue. Instead, licensing revenue dropped from $4 million in 2004, to $1 million in 2009.

## C. *Plaintiff Blames Copyright Infringement for its Losses*

Rather than attribute the decline in licensing revenue to the precipitous decline in new home construction,[2] Plaintiff determined that its losses were due to "the ready availability of [Plaintiff's] copyrighted designs both print and on the internet" which, Plaintiff asserts, resulted in "rampant" violations of Plaintiff's copyrights. (ECF No. 75-2 at 7). What Plaintiff did in response was either an "intellectual property shakedown" and "copyright trolling," *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1096–98 (7th Cir. 2017), or the vigorous protection of its copyrighted works (ECF No. 73-1 at 10), depending on your point of view.

What is undisputed is that Plaintiff set out on a concentrated effort to uncover what it viewed as the violation of its intellectual property rights. A large part of this effort was turning its staff and even its independent contractors into copyright detectives. As described by its COO,

---

[2] Housing starts fell from a high of 2.3 million in January 2006, to 466,000 in January 2009, a drop of nearly 80%. https://money.cnn.com/2009/02/18/news/economy/housing_starts/index.htm

Plaintiff "compensated employees or independent contractors . . . who discovered incidents of infringement that led to settlements or judgments by paying them a percentage of the amount recovered from litigation."[3] (ECF No. 73-1 at 11). The detective work was not limited to internet searches for offending designs. Instead, Plaintiff conducted multiple "controlled buys"[4] at different lumberyards to find draftsmen who were copying Plaintiff's plans. (*Id*. at 9). Due to these investigative techniques, Plaintiff discovered five different instances where its designs were being appropriated. (ECF No. 75-2 at 5–6).

As a result of its investigations, Plaintiff has filed suit against approximately 150 builders alleging copyright infringement. This represents a lawsuit against 1 in every 300 builders in the United States. (ECF No. 73-1 at 11). Forty of those lawsuits were filed in Indiana alone. Plaintiff does not settle cases for "nuisance value," but instead states that its "settlement revenue reflects *defendants'* assessment of the risks of substantial infringement verdicts." (*Id*.) (original emphasis). While the amount of "settlement revenue" has not been disclosed to the Court, counsel for Plaintiff in a different matter described the revenue as "substantial." *Lexington*, 858 F.3d at 1098, n.1.

### D. *Plaintiff Discovers Defendant's Plans*

Following the Great Recession, Plaintiff took steps to update its database to account for new home builders. Between May and July 2013, Plaintiff's Director of Business Development compiled a list of 527 Indiana home builders "for the purpose of determining whether the company would make further direct marketing efforts to current and potential builder customers." (ECF No. 73-2 at 2). He then visited the websites for each of the 527 builders "to see the types of homes the

---

[3] Plaintiff claims that this practice of compensation ended on September 1, 2017, after this litigation was filed. (ECF No. 73-1 at 11).

[4] A controlled buy is an investigative tool, most commonly used in drug investigations, whereby an individual, generally a confidential informant, purchases contraband from another individual with funds provided by the investigating entity. *See, e.g.*, *United States v. Wilburn*, 581 F.3d 618, 621 (7th Cir. 2009).

builder was building so [he] could see if the builder would be a good candidate to become a Design Basics customer." (*Id.*).

On June 11, 2013, the Director of Business Development visited Defendant's website. During that visit, he "discovered four home plans that appeared to be copies from Design Basics' home designs." Those plans, and Plaintiff's corresponding designs, were:

|   | Design Basics' plan | Defendant's accused plan |
|---|---|---|
| 1 | Monte Vista, #1032 | Arthur Williams |
| 2 | Lancaster, #1752 | David Matthew I |
| 3 | Paterson, # 1380 | David Matthew II |
| 4 | Sinclair, # 1748 | Greyson |
| 5 | Cavanaugh, # 8540 | Shelley |

From a subsequent review of more than 1,000 home plans produced by Defendant, Plaintiff believes that at least 143 instances of infringement occurred.

Because a determination of infringement can only be made from a review of the actual plans, it is necessary to review the plans. The following represents a side-by-side comparison of the relevant plans:

DB's Monte Vista                              Heller's Arthur Williams



## DB's Lancaster







## Heller's David Matthew I







DB's Paterson

Heller's David Matthew II(a)



DB's Paterson                          Heller's David Matthew II(b)[1]





DB's Sinclair                    Heller's Greyson



DB's Cavanugh                    Heller's Shelley



 

**E.** *The Battle of the Experts*

Both parties have retained experts for the purposes of comparing the relevant plans. Defendant's expert, Robert Greenstreet, is an Oxford-educated architect and the current Dean of the School of Architecture and Urban Planning at the University of Wisconsin-Milwaukee. Professor Greenstreet submitted an eighteen-page expert report, accompanied by a fifty-two-page appendix setting forth what he viewed as the differences between Plaintiff's and Defendants' plans.

Professor Greenstreet recognizes a superficial similarity between the plans, but attributes the similarity to the nature of the homes being designed rather than infringement.

> Given their similar building programs and niche within the housing market, even in the absence of any copying or use of the Plaintiff's plans, they are likely to conform to generally accepted expectations in scale, size, inventory of rooms, layout and appearance, maintaining the same look and feel, and therefore will not appear markedly different from many other standard housing variants in the residential market.

(ECF No. 69 at 8). Given the general similarity of moderately priced, single-family dwellings, Professor Greenstreet focuses on the details of the plans. As a result of that focus, Professor Greenstreet concludes:

> Despite general similarities normally anticipatable in the traditional, conventional housing market, there are still many differences detectable between the compared models produced by Design Basics and Heller, specifically in their respective square footage, dimensions, program, plan layouts, massing, use of materials and appearance that reject the notion of substantial similarity.

(*Id*. at 16).

Not to be outdone, Plaintiff submitted a two hundred twenty-six-page expert report from Matthew McNicholas, a Notre Dame-trained architect and owner of his own architecture firm. Unsurprisingly, McNicholas rejects the opinion of Professor Greenstreet. In large part, McNicholas' rejection of Professor Greenstreet's report stems from his belief that the differences identified by Professor Greenstreet are not differences in design, but instead variations within the same design.

> And focusing the infringement analysis on individual standard elements like doors, décor, or building materials, or on "subtle differences" . . . like a transom window, the presence/absence of a linen closet, or the placement of fixtures ignores the primary design intention and elevates the tertiary aspects. *In other words, it is not a true evaluation of design*.

(ECF No. 73-15 at 25) (original emphasis).

McNicholas expounds on this critique in painstaking detail in Section 5B of his report, where he specifically responds to each and every difference identified by Professor Greenstreet. (ECF No. 73-15 at 70–143). In large part, McNicholas' responses fall into one or both of two categories: (1) differences that are "immaterial" because they involve "standard elements"; or (2) differences that "do not change the arrangement and composition of the spaces or the overall form."

Rather than dwell on the micro, McNicholas' evaluation of the plans is macro in scope. In Section 7D of his report, McNicholas resizes, reorients, and overlays the plans to demonstrate what he believes to be the "supersubstantial similarity" between the plans. Those overlays appear as follows (Plaintiff's design is in blue, with Defendant's design in red):

PATTERSON/DAVID MATTEWS II



SINCLAIR/GREYSON



LANCASTER/DAVID MATTHEW I





CAVANAUGH/SHELLEY



(ECF No. 73-15 at 193–217). The report also contains a detailed breakdown on the similarities in what McNicholas describes as the "elective design decisions" in the plans; i.e., those decisions not dictated by code, zoning, or customer preference requirements.

**LEGAL ANALYSIS**

**A.** *Defendant's Daubert Motion*

Before addressing summary judgment, the Court must address Defendant's motion to exclude and strike McNicholas' report (ECF No. 80). In essence, Defendant claims that McNicholas' report fails to meet the standard for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because McNicholas "did not exclude protectable, customary and standard arrangements found in the subject plans when comparing and evaluating the plans for substantial similarity." (ECF No. 80 at 1). For the reasons set forth below, the Court finds that McNicholas' report clears the *Daubert* hurdle, and will deny the motion to strike.

1.  THE *DAUBERT* STANDARD AND RULE 702

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert. Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 804 (7th Cir. 2012) (quoting Fed. R. Evid. 702). In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the court is to "scrutinize the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed

reliable enough to present to a jury." *Lapsley*, 689 F.3d at 805 (quoting *Kumho Tire*, 526 U.S. at 152). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("[W]e 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705; *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified."). Under Rule 104(a), the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.

District courts apply the *Daubert* framework using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). First, the Court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. If so, the Court must then decide whether the reasoning or methodology underlying the expert's testimony is reliable. If these two requirements are met, the Court must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or to determine a factual issue. *See id.* (citing *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

"Although the court must decide questions of admissibility, the weight and credibility to be accorded expert testimony is properly left to the jury." *Contractor Util. Sales Co. v. Certain-teed Prods. Corp.*, 638 F.2d 1061, 1085 n.32 (7th Cir. 1981). The Defendant will have the opportunity to expose those weaknesses at trial and, as the court in *Daubert* stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

2.      THE *DAUBERT* ANALYSIS

Applying the three-part *Daubert* analysis, this Court has little trouble concluding that McNicholas' report is admissible. First, McNicholas is plainly qualified. McNicholas has B.A. and master's degrees in architecture from the University of Notre Dame. He is licensed in the State of Indiana and has been practicing architecture for more than fifteen years. McNicholas has operated his own architecture firm for the last ten years. McNicholas has also provided expert reports and/or testified as an expert in fifteen cases over the last four years.[5] The Court determines that McNicholas' knowledge, skill, experience, training, and education qualify him as an expert in this case. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area").

The primary dispute over Defendant's motion to exclude lies in the second part of the analysis. Defendant asserts that McNicholas' methodology is not sufficiently reliable because it fails to use the "widely-accepted test used for evaluating substantial similarity." (ECF No. 80 at 1). The Court disagrees. McNicholas discusses the Architectural Works Copyright Protection Act ("AWCPA") at length, citing to statutory language and legislative history on how to determine substantial similarity. (ECF No. 73-15 at 15–23). McNicholas discusses customary and standard elements throughout his report. Defendant disagrees with McNicholas' analysis, but this is not a basis for striking an expert report. The soundness of the factual underpinnings of the expert's

---

[5] In all these cases McNicholas acts as an expert for Plaintiff. Were the admissibility of the report a closer call, this fact would give the Court pause since part of the qualifications analysis is ensuring that the Court is "dealing with an expert, not just a hired gun." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996).

analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment. *See Daubert*, 509 U.S. at 595.

Finally, the Court finds that McNicholas' report could assist a trier of fact in this case. In making this determination, a court must "consider whether the proposed . . testimony fits the issue to which the expert is testifying." *United States v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999). McNicholas' report addresses directly the issue of substantial similarity, which is the issue on which he is testifying. The Court also notes that a substantially similar report from McNicholas has been relied upon by a different district court in ruling on a similar motion for summary judgment. *See Design Basics, LLC v. Ashford Homes, LLC*, 2018 WL 6620438 (S.D. Ohio 2018). Accordingly, this Court finds that McNicholas' report is admissible under both *Daubert* and Rule 702 and denies Defendant's motion to exclude.

**B.      *Defendant's Motion for Summary Judgment***

1.      SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide,

based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

2.    THE AWCPA

Copyright protection for "architectural work" is now[6] provided under the AWCPA, which defines such work as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The protected work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. §§ 101, 102(a)(8). In enacting the AWCPA, Congress intended to extend protection to the "arrangement and composition of spaces and elements" in architectural works, in recognition of the fact that "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of [non-protected] elements into an original, protectable whole." H.R. Rep. No. 101–735 (1990), reprinted in 1990

---

[6] Prior to the AWCPA, architectural plans could receive copyright protection as "pictorial, graphic, and sculptural works," but structures were not protected. *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 188 (2nd Cir. 2012).

U.S.C.C.A.N. 6935, 6949. However, the protections of the AWCPA were not intended by Congress to afford copyright protection to "individual standard features," such as "common windows, doors, and other staple building components." *Id.*

To prevail on a copyright claim, a plaintiff must prove both ownership of a valid copyright and that the defendant copied original or "protectible" aspects of the copyrighted work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991). Copying can be proved two ways. First is direct evidence of copying, but this is "rarely available." *Lexington*, 858 F.3d at 1099. The second is by showing that the defendant had access to the copyrighted work, and that the works in question are "substantially similar" such that an inference of copying can be made. *Id.* For the purposes of summary judgment, the parties do not contest the validity of Plaintiff's copyrights, the absence of direct proof of copying, or Defendant's access to the copyrighted designs. Instead, the sole issue presented to the Court is whether Defendant's designs are substantially similar to the corresponding copyrighted designs of Plaintiff.

3.    SUBSTANTIAL SIMILARITY

While, as discussed below, the Circuits disagree as to how substantial similarity is to be judged, the common theme that binds the decisions is the idea that only protectable expression is protected. However, the definition of protectable expression can be elusive. The distinction between protectable expression and non-protectable ideas is often described in flowery, poetic terms. Take, for example, Judge Learned Hand who explained the distinction as follows:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930). The legislative history

provides equally creative descriptions for the distinction. Architect Michael Graves, a witness

before the Judiciary Subcommittee, testified that there are:

> two types of architectural language, "internal" and "poetic." Internal language is
> "intrinsic to building in its most basic form–determined by pragmatic,
> constructional, and technical requirements." Poetic language is "responsive to
> issues external to the building, and incorporates the three-dimensional expression
> of the myths and rituals of society."

H.R. Rep. No. 101–735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6950. The intent of the

legislation is to protect only what Graves calls "poetic language." *Id*.

The "internal architectural language" described by Graves is separately referred to as the

doctrine of *scenes a faire* by reviewing courts. Essentially, the doctrine "teaches that elements of

a work that are 'indispensable, or at least standard, in the treatment of a given topic' . . . get no

protection." *Lexington*, 858 F.3d at 1102. A corresponding doctrine, the doctrine of merger,

provides that "some ideas can only be expressed in a limited number of ways such that idea and

expression merge, with the resulting amalgam receiving no copyright protection." *Id*. (citations

omitted). While the Circuits generally agree on the foregoing, the precise application of these ideas

has led to significant differences in how architectural copyright cases are resolved.

a.      Lexington *and the Seventh Circuit*

Even if one discounts the unfavorable descriptions of Plaintiff's litigation tactics,

*Lexington*, which granted summary judgment against Plaintiff, nonetheless presents significant

issues for architects claiming copyright protection for single-family homes. The intellectual basis

for the *Lexington* decision is the idea that, particularly in cases involving homes like the ones at

bar, "the designer's or architect's copyright [is] thin, so that only very close copying of protected

elements is actionable." *Id*. at 1101.

The challenge of proving substantial similarity is heightened where the field is crowded or where aesthetic choices may be secondary to consumer demands or functional requirements. The challenge is particularly acute in the market for affordable designs for single-family homes, where form follows function so closely. Blueprints drafted by companies like Design Basics and Lexington are meant to appeal to home builders and buyers who want to build, sell, and buy homes that will hold their value. While it is possible to design a home that is a one-of-a-kind work of art, the home designs here do not fit that description. They comprise familiar configurations of spaces and features, having less in common with the work of Frank Gehry or Frank Lloyd Wright and more with that of William Levitt.

*Id.*

Given the similarities, the Seventh Circuit requires an "analytic" review of plans in making the substantial similarity determination. A district court cannot survey plans "from 30,000 feet, or even 500 feet." *Id.* at 1105. Applying this analytic review, the Seventh Circuit determined that "aesthetic distinctions" rendered the plans in *Lexington* sufficiently dissimilar.

As noted, a close study of Design Basics' and Lexington's plans reveals many aesthetic distinctions, further undercutting Design Basics' claim that Lexington took anything that belonged to it. Dr. Greenstreet, Lexington's expert, identified 46 differences between Design Basics' Aspen and Lexington's Carlisle; 54 differences between Design Basics' Kendrick and Lexington's Oakridge; 49 differences between Design Basics' Taylor and Lexington's Ashwood; and 62 differences between Design Basics' Womack and Lexington's Easton. Dr. Greenstreet spotted differences in dimensions and spatial relationships, in roofing configurations and building materials, and in carpentry and decor. Given the economic and functional constraints on the designers and the vast body of similar designs in the public domain, these many differences are not trivial.

*Id.* at 1103 (footnote omitted). Accordingly, this Court views *Lexington* as requiring the Court to focus on the differences between the plans rather than the similarities. Where sufficient differences exist, the existence of superficial similarity cannot demonstrate a copyright violation.

b.      T-Peg *and* Sturdza – *A Different View from the D.C. and First Circuits*

Not surprisingly, Plaintiff would prefer that this Court not rely on a case that names it a "copyright troll." Although Plaintiff understands that this Court is bound by *Lexington*, it nonetheless suggests that the First Circuit's decision in *T-Peg, Inc. v. Vermont Timber Works, Inc.*,

459 F.3d 97 (1st Cir. 2006), and the D.C. Circuit's decision in *Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002), "better apply the AWCPA as Congress intended it." (ECF No. 75 at 12, n.2). These decisions are illustrative of a different approach to the substantial similarity issue.

In *Sturdza*, the D.C. Circuit was tasked with reviewing plans for the UAE's embassy to determine whether the final plans violated the copyrighted plans of the plaintiff. While the D.C. Circuit used many of the same doctrines espoused in *Lexington*, it differs significantly from *Lexington* in the focus of the inquiry. As stated by the D.C. Circuit,

> The substantial similarity determination requires comparison not only of the two works' individual elements in isolation, but also of their overall look and feel. An allegedly infringing work is considered substantially similar to a copyrighted work if the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same. Put another way, the touchstone of the analysis is the overall similarities rather than the minute differences between the two works. Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements. For example, while color is not protectible, the manner in which an artist selects, coordinates, and arranges color may be.

*Sturdza*, 281 F.3d at 1296 (citations and quotations omitted).

*Sturdza* also differs from *Lexington* in its application of the summary judgment procedure to substantial similarity cases. While *Lexington* speaks of substantial similarity as susceptible to summary judgment, *Lexington*, 858 F.3d at 1105, *Sturdza* observes that "because substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation," *Sturdza*, 281 F.3d at 1296 (quotation omitted). Thus, under the *Sturdza* analysis, a court is to focus on the similarities rather than the differences, and summary judgment should rarely be entered.

*T-Peg* hews closely to the *Sturdza* analysis. Much like *Sturdza*, the First Circuit focused its analysis on the similarities between works rather than the differences.

> Substantial similarity can be measured by the ordinary observer test. Under that test, two works will be said to be substantially similar if a reasonable, ordinary observer, upon examination of the two works, would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression. The two works need not be exact copies to be substantially similar. Differences between the works have some effect on the inquiry, but the mere existence of differences is insufficient to end the matter in the defendant's favor. If the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are, within the context of plaintiff's work, of minimal importance, either quantitatively or qualitatively, then no infringement results.

*Id*. at 112 (citations omitted). Also similar to *Sturdza*, *T-Peg* advises that summary judgment on the issue of substantial certainty should be "unusual." *Id*.

While the differences between *Lexington*, *Sturdza*, and *T-Peg* are significant, the Court would suggest that the differences are more likely the result of the buildings at issue rather than any fundamental difference in the interpretation of the AWCPA. The buildings at issue in *Sturdza* (a large embassy building) and *T-Peg* (a one-off timber frame home) unquestionably provide for more latitude and creativity than moderately priced, single-family homes. While the parties here are bound to design homes that are affordable, resaleable, and widely appealing, the architects in *Sturdza* and *T-Peg* had no such limitations.

Instead, the architects in the latter cases had the freedom to design purpose-built structures for an idiosyncratic customer. It makes sense that, in those situations, similarities would have more relevance. The designs in *Sturdza* and *T-Peg* were never intended to be duplicated, so duplication of any aspect of those designs is necessarily suspect. That is not so in the designs at issue here. The only way one can design homes that can house the millions claimed by Plaintiff is to prepare designs that can appeal to people across ethnic, socioeconomic, and cultural lines. They must be designed, then, to be generally like other popular home designs. The whole point of Plaintiff's

designs is that they are easily reproducible for a wide variety of customers (as evidenced by the fact that many of the licenses it sold were for unlimited builds). Where reproducibility is a virtue, similarities to other structures will necessarily exist. In those kinds of cases, then, it makes sense to focus on differences. Since this case is in the latter category, the Court concludes that the analysis in *Lexington* is more applicable here.

c.      *Views from the Other Circuits*

A survey of the other Circuits that have addressed the architectural copyright issue continues to show a variety of approaches to the issue of substantial similarity. However, for the most part, those approaches lean more to the side of *Lexington* than they do *Sturdza* or *T-Peg*. What the Court has found in reviewing those cases is a general focus on the details of plans, with the courts paying more attention to differences than similarities.

Most similar to *Lexington* is the Second Circuit and its decision in *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95 (2d Cir. 2014). The similarity between *Lexintgton* and *Zalewski* is no surprise; *Lexington* is largely based upon the legal discussion in *Zalewski*. *See Lexington*, 858 F.3d at 1101 ("We agree with *Zalewski* . . .".). *Zalewski* refers to architectural works as "compiled" works, entitled to only a "thin" copyright based on the "arrangement and coordination of unoriginal and uncopyrightable elements." *Zalewski*, 754 F.3d at 103. However, the Second Circuit was quick to note that not all arrangements and coordinations are protected; elements attributable to building codes, topography, existing structures, engineering necessity, traditional styles, market expectations, and other generalized factors cannot be protected. *Id*. at 105. Finding that the similarities between the plans at issue were the result of "features of all colonial homes, or houses in general," the Second Circuit looked to "subtle differences" in doors, windows, closets, and countertops to find no substantial similarity. *Id*. at 106–07.

In *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218 (11th Cir. 2008), the court examined alleged copyright infringement in the design of the Miami Trump Tower. While the legal discussion in *Oravec* does not add anything more than the foregoing authorities, its application of those authorities is noteworthy as it applies to more peculiar design choices. Specifically, the plaintiff in *Oravec* pointed to a number of features in the designs which, at least superficially, would seem unlikely to have been reproduced accidentally, including: alternating convex and concave sections; exposed elevator towers extending above the roofline; rounded building ends; holes in the building; "see-through" units; and a rooftop pool with landscape elements. *Id*. at 1225-27. Despite noting that many of the same elements appeared in the Trump Tower, the Eleventh Circuit nonetheless found that the designs were not substantially similar. The court noted that many of the elements were in different locations in two designs, and that others were either "standard features or ideas." *Id*. at 1227. Ultimately, the court concluded that the similarity in the designs was "too generalized" to warrant copyright protection. *Id*. at 1227-28.

Finally, *Savant Homes, Inc. v. Collins*, 809 F.3d 1133 (10th Cir. 2016), demonstrates a different formulation of the test altogether. The Tenth Circuit utilizes what it termed the "AFC test." As described by the court:

> The AFC test derives its name from its three steps. At the abstraction step, we separate the ideas (and basic utilitarian functions), which are not protectable, from the particular expression of the work. Next, we filter out the nonprotectable components of the product from the original expression. Finally, we compare the remaining protected elements to the allegedly copied work to determine if the two works are substantially similar.

*Id*. at 1144. Notably, the court declined to follow *Sturdza*'s "overall look and feel" analysis noting that, while Tenth Circuit cases had cited to *Sturdza*, it was only "as an illustration of the idea/expression dichotomy." *Id*. at 1145. Using the AFC test, the court found that a ranch home design with two bedrooms on one side and a master bedroom on the other, separated by a combined

family room, dining room, and kitchen to not be sufficiently distinctive to support an infringement claim against a different home with the same layout. *Id*. at 1136.

4.  *LEXINGTON* REQUIRES SUMMARY JUDGMENT IN FAVOR OF DEFENDANT

Regardless of which approach this Court would prefer, it is bound by Seventh Circuit precedent. Thus, *Lexington* controls. *Lexington* requires that this Court view the plans objectively to determine "whether the accused work is so similar to the plaintiff's work that an ordinary, reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Lexington*, 858 F.3d at 1101. In applying this test, the Court must be mindful of the Seventh Circuit's determination that Plaintiff's copyright is thin, and that only very close copying of protected elements is actionable. *Id*.

The parties have essentially designated three pieces of evidence from which to make the substantial similarity decision: (1) the plans themselves; (2) Professor Greenstreet's report; and (3) McNicholas' report.[7] Having reviewed each of those pieces of evidence in light of *Lexington*, and giving every reasonable inference to Plaintiff, this Court concludes that summary judgment is appropriate.

1.  *The Plans*

The Court would initially note that reviewing the plans is the quintessential five-hundred-foot view that the Seventh Circuit disapproved of in *Lexington*. *Lexington*, 858 F.3d at 1105. Therefore, even if the Court found the plans to be similar on their faces, it would still be required to take a more detailed look to determine whether differences existed at a more detailed level.

---

[7] The Court notes that at least one court has concluded that expert testimony cannot be used to determine substantial similarity because "the ordinary observer test is an objective one." *Trek Leasing, Inc. v. United States*, 66 Fed. Cl. 8, 18 (2005). Despite designating a detailed expert report in support of its Motion for Summary Judgment, Defendant appears to make a similar argument in its Reply. (*See* ECF No. 78 at 4–5). Because the Seventh Circuit in *Lexington* approved of the use of an expert report as an "analytical tool" in that case, this Court finds that the expert reports are properly considered here.

However, as the Court understands the *Lexington* ruling, **differences** at the plan level are relevant. After all, if a difference is evident at five hundred feet, it will be all the more evident during a detailed walk-through. In reviewing the plans, the Court finds numerous differences that are noticeable even to the Court's untrained eye.[8] These differences support a finding that the designs are not substantially similar.

a.      Paterson/David Matthew 2

While the overall footprint and room layout is very similar in the first floors, there are nonetheless obvious differences. The Paterson has a bay window in the breakfast nook area but not in the great room, while the placement of the bay window is reversed in the David Matthew 2. The master bathroom is larger in the Paterson and is oriented differently than the David Matthew 2. In addition, the Paterson has a large covered porch which does not exist on the David Matthew 2 design.

The second floors show similar symmetry in the footprint and layout, but also differences. Bedroom #3 in the David Matthew 2 has a closet that extends the length of bottom wall of the plan, while the corresponding bedroom on the Paterson has a smaller closet and a cutout for a desk. Again, the bathrooms are different sizes and orientations, this time with the David Matthew 2 having the larger space. In addition, the second floor on the David Matthew 2 has two hall closets that are not in the Paterson plan.

---

[8] The observations in this section are primarily based on the overlays that are included in Mr. McNicholas' report at pages 195-215. The Court has chosen the overlays because, in many instances, they have been admittedly mirrored and re-sized by McNicholas, and therefore should be the best evidence of similarity. The Court would note, however, that the Seventh Circuit specifically admonished Plaintiff for providing similar "manipulated images" in *Lexington*. *Lexington*, 585 F.3d at 1103, n.6.

b.      Sinclair/Greyson

Again, the Court sees similar footprints and layouts, but differences in the details. The Sinclair has a smaller master bedroom, but a much larger master bathroom with a whirlpool tub, skylight, and double vanity that do not appear in the Greyson. In the kitchen, the Sinclair features an "L" shaped countertop which creates a "snack bar." This feature is missing in the Greyson, which instead includes a kitchen island. The breakfast nook/hearth room is significantly larger in the Greyson than in the Sinclair. Moving to the guest bedrooms, the location of the closet is different in what is bedroom #2 on the Greyson, which in turn results in a larger foyer in the Greyson. The guest bathroom on the Sinclair has a skylight which does not appear on the Greyson plan. Finally, the Greyson plan includes a third bathroom where the laundry space is located in the Sinclair plan.

c.      Lancaster/David Matthew 1

Per the theme, these designs see similar footprints and layouts with numerous differences within the envelope of the home. The Lancaster has a wrap-around porch that is not present in the David Matthew 1. The omission of the porch allows the David Matthew 1 to include a large walk-in closet off the foyer that is not featured in the Lancaster. The entry into the homes from the garages are located in different places, which allows the David Matthew 1 to add a closet/pantry that is not in the Lancaster. The breakfast nook in the Lancaster has a bay window that does not appear on the David Matthew 1.

There are significant differences on the second floor, most notably in the master suite. The orientation of the suite is completely flipped between the two plans, with the bathroom on top in the David Matthew 1 and the bathroom on the bottom in the Lancaster. This results in a much larger bathroom in the Lancaster, featuring a double vanity that does not appear in the David

Matthew 1. The location of the walk-in closet is also different; it is off the master bedroom in the Lancaster, and off of the master bathroom in the David Matthew 1. In fact, the Lancaster has two walk-in closets off of the master bedroom. The David Matthew 1 sacrifices one of the closets in the master bedroom in favor of a walk-in closet in what it labels Bedroom #4. The Lancaster does not have a walk-in closet in its corresponding bedroom, instead opting for a traditional closet on the bottom wall.

d.    Monte Vista/Arthur Williams

The plans here show many of the same similarities and differences. Again, the master suites are significantly different. The master bathroom on the Monte Vista is much larger, featuring a double vanity and skylight that are not present in the Arthur Williams. In addition, the walk-in closet is off the master bathroom in the Monte Vista, but off of the master bedroom in the Arthur Williams. The master bedroom is also much larger in the Arthur Williams, owing to the smaller bathroom. The breakfast nook on the Monte Vista has a bay window that is absent from the Arthur Williams. Over in the guest area, the Monte Vista has two closets accessible from the hallway. The Arthur Williams has no closet accessible from the hallway, but instead has a single linen closet in the bathroom. Finally, the Arthur Williams features a third bathroom, which the Monte Vista uses this space as a laundry area.

e.    Cavanaugh/Shelley

These plans are the most similar on the first floor but differ wildly on the second floor. The differences on the first floor are modest. The master bathroom on the Shelley has a double vanity where the Cavanaugh does not. The laundry areas and first floor half-baths are located in the same area but are accessible from different walls. In addition, the family room in the Cavanaugh has a

bay window that it not in the Shelley, while the Shelley family room features a fireplace that is not in the Cavanaugh plan.

The second floors bear no resemblance whatsoever. The second floor on the Cavanaugh is small, containing two small bedrooms and a small guest bath. The second floor on the Shelley, on the other hand, is expansive. The entirety of the Cavanaugh's second floor could be contained in the loft area of the Shelley. From there, the Shelley includes three bedrooms and a full bath in space that does not exist on the Shelley. While the Cavanaugh does note an "optional expansion," the space would still be significantly smaller on the Cavanaugh, and the layouts would remain distinctly different.

2.    *The Expert Reports*

The Court must first address Plaintiff's contention that the mere existence of dueling expert reports requires the denial of Defendant's Motion for Summary Judgment. (*See, e.g.*, ECF No. 75 at 3–4). The Court agrees with Plaintiff that when "genuine differences of expert opinion addressed to the relevant factual question are expressed in opposing affidavits, the case is not a proper case for summary judgment." *United States v. 7 Cartons, More or Less * * * "Ferro-Lac Swine Formula Concentrate (Medicated)"*, 293 F. Supp. 660, 663 (S.D. Ill. 1968), *aff'd in part, vacated in part sub nom. United States v. Seven Cartons, More or Less, "Ferro-Lac Swine Formula Concentrate"'*, 424 F.2d 1364 (7th Cir. 1970). However, inherent in that statement is the assumption that both experts are addressing the "relevant factual question." Because this Court finds that McNicholas does not address the substantial similarity question in a way recognized by the Seventh Circuit, this Court concludes that his report cannot create a genuine issue of material fact.

The fundamental problem with McNicholas' report is that his view of what constitutes a "difference" between plans as an architect is different from what constitutes a "difference" under Seventh Circuit precedent. No excerpt from his report sums up this problem more than McNicholas' following statement:

> Identifying the differences of individual standard or functional elements such as doors, windows, fireplaces, lamps, desks, benches, tubs, kitchen cabinetry, washbasins, furnaces, or roofs, etc.[9] is just as immaterial as identifying the similarities in those elements. And again, identifying differences in dimension or square footage should be excluded the same as identifying similarities in such should be.

(ECF No. 73-15 at 69). The Court does not doubt McNicholas' belief in this statement, as he makes similar remarks throughout his report. Unfortunately for Plaintiff, the Seventh Circuit does not share this belief.

The very differences that McNicholas' labels "immaterial" are the differences that the Seventh Circuit relied upon in *Lexington*. There, the court noted "many aesthetic distinctions," including "differences in dimensions and spatial relationships, in roofing configurations and building materials, and in carpentry and décor." *Lexington*, 585 F.3d at 1103. Note 5 to the decision expounds on the differences the court viewed as relevant, which included differences in doors, windows, tubs, washbasins, and roofs, as well as dimensions. *Id*. at 1103, n.5. Because McNicholas' opinion is based upon excluding these very differences from his analysis, it cannot create a genuine issue of fact under *Lexington*.

The Court also has concerns regarding the scope of protections that McNicholas' analysis would provide when taken to its conclusion. McNicholas uses the phrase "the overall arrangement

---

[9] McNicholas later accuses Professor Greenstreet of "fabricat[ing] the appearance of differences" by pointing out these differences. McNicholas' accusation is both legally incorrect in light of *Lexington*, but also of little help to the Court in its heavy-handed use of language. This is not the only instance of such language use, as the overall tenor of McNicholas' report is one of not just disagreement with, but contempt for, Professor Greenstreet.

and composition of spaces" throughout his report to define what he views as the key factor in determining substantial similarity. (*See*, *e.g.*, ECF No. 73-15 at 71). To be sure, this language exists in the AWCPA. However, McNicholas' view of what constitutes "the overall arrangement and composition of spaces" is so broad as to be almost universally applicable. Take, for instance, the "inconsequential and unsubstantial" variations he notes on page 67 of his report: "changing a dimension, moving a closet, eliminating a bathroom, or rearranging the appliances in a kitchen, or the fixtures in a bathroom." (*Id*. at 70). If two plans can be so different that one *eliminates rooms* from the other but remain substantially similar in the view of McNicholas, then his view is difficult to square with the law.

The Court's concern is particularly directed at those designs that fall into one of the many home types; i.e., craftsman, traditional, colonial, etc. Take, for example, the classic American Foursquare design, an early 20th century staple of urban neighborhoods. These homes are almost always two stories, with a large attic shaped by a steep-sloped hipped roof. The most common interior floor plan consists of dividing each level into four primary spaces: a foyer, living room, dining room, and kitchen on the first floor; four bedrooms and a bathroom on the second.[10] Given the square footprint, there were a limited number of ways to lay out these primary spaces. Accordingly, many American Foursquare homes will have similar, if not identical, overall arrangement and composition of spaces.

If McNicholas' view of infringement is correct, then no one can build or design an American Foursquare without infringing upon a prior design. This is true because, regardless of the dimensions, special relationships, closet placement, or kitchen orientation, to be an American Foursquare, it must necessarily feature a similar overall arrangement and composition of spaces as

---

[10] http://www.oldhouseweb.com/blog/the-american-foursquare/

every other example. Yet no one is concerned about this for one simple reason: when dealing with "cookie-cutter" homes, and there can be little doubt that the plans at issue here are just that, it is the differences in the details, materials, and touches that create the home.

Just as no one can claim protection for a home design featuring a foyer, kitchen, living room, and dining room on the first floor, Plaintiff cannot lay claim to all designs featuring a front door that leads to a foyer with a den on the right, an open-concept kitchen/living space directly in front, and a master suite on the far left (i.e., the Cavanaugh). Instead, where copyrights are "thin," it is the details that matter.

What the Court is left with, then, is a fifty-two-page summary of the differences that the Seventh Circuit finds relevant compiled by Professor Greenstreet. That summary shows 93 differences between the Monte Verde and the Arthur Williams; 80 differences between the Lancaster and the David Matthew 1; 101 differences between the Paterson and the David Matthew 2 (Version 1); 118 differences between the Paterson and the David Matthew 2 (Version 2); 76 differences between the Sinclair and the Greyson; and 74 differences between the Cavanaugh and the Shelley. Based on the number of differences found in *Lexington*, these are more than enough. *Lexington*, 858 F.3d at 1103. Accordingly, summary judgment in favor of the Defendant is warranted, and will be entered.

## C.    *Attorneys Fees*

Section 505 of Title 17 of the United States Code provides that the Court, in its discretion, may award "reasonable attorney's fees to the prevailing party." Having determined that Defendant is the prevailing party, it is appropriate for the Court to determine whether, and in what amount, attorneys fees are warranted. Accordingly, this Court orders Defendant to submit, within thirty days of the date of this Opinion and Order, its request for fees setting forth: (1) its legal argument

for entitlement to fees; and (2) its evidence of its reasonable fees. Plaintiff shall have thirty days after the filing of Defendant's request to file a response. Upon review of those filings, this Court will enter a separate order on fees.

## CONCLUSION

For the foregoing reasons, Defendant's Second Motion for Summary Judgment (ECF No. 64) is GRANTED. The parties are ordered to submit filings on the appropriateness of fees as set forth above.

SO ORDERED on June 24, 2019.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT